John Morrison
Scott Peterson
MORRISON, SHERWOOD, WILSON, & DEOLA, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
speterson@mswdlaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION**

| | |
|---|---|
| JOHNNY C. RUTHERFORD, JR. and MARY RUTHERFORD, and JOHNNY RUTHERFORD ON BEHALF OF THOSE SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company, doing business in Montana as Blue Cross and Blue Shield of Montana, and the MONTANA UNIVERSITY SYSTEM.<br><br>Defendants. | Cause No: 6:24-CV-00081-BMM<br><br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF RENEWED, SUPPLEMENTAL MOTION TO CERTIFY CLASS UNDER RULE 23(B)(3)** |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

PROCEDURAL BACKGROUND ....................................................................1

FACTS PERTINENT TO CLASS CERTIFICATION...............................................2

CLASS DEFINITION.....................................................................................12

CLASS CERTIFICATION STANDARD .............................................................14

DISCUSSION ...............................................................................................15

    I.      The Requirements of Rule 23(a) Are Satisfied .................................15

        A.    Numerosity ...........................................................................15

        B.    Commonality .........................................................................17

        C.    Typicality..............................................................................20

        D.    The Named Plaintiff Will Adequately Protect the Interest of The Class ..................................................................................21

            1.  No Conflicts ....................................................................22

            2.  Vigorous Pursuit .............................................................22

    II.     The Requirements of Rule 23(b)(3) Are Satisfied ............................23

        A.    Predominance .........................................................................23

        B.    Superiority ............................................................................27

CONCLUSION ..............................................................................................28

CERTIFICATE OF COMPLIANCE ...................................................................29

# TABLE OF AUTHORITIES

## Cases

*Beck v. City of Whitefish*
  2023 U.S. Dist. LEXIS 175922 (D. Mont. Sep. 29, 2023)...................17

*Butler v. Unified Life Ins. Co.*
  2019 U.S. Dist. LEXIS 169138 (D. Mont.).........................................12

*Caldera v. Am. Med. Collection Agency*
  320 F.R.D. 513 (C.D. Cal.2017)........................................................28

*Castillo v. Bank of Am., NA*
  980 F.3d 723 (9th Cir. 2020) .............................................................20

*Cummings v. Connell*
  316 F.3d 886 (9th Cir. 2003) .............................................................22

*Ellis v. Costco Wholesale Corp.*
  657 F.3d 970, 983 n.8 (9th Cir. 2011) ....................................19, 20, 22

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Cir. 1998) ...........................................................22

*Ikonen v. Hartz Mountain Corp.*
  122 F.R.D. 258 (S.D. Cal. 1988) .......................................................15

*Johnson v. City of Grants Pass*
  50 F.4th 787 (9th Cir. 2022)..............................................................15

*Just Film, Inc. v. Buono*
  847 F.3d 1108 (9th Cir. 2017) ...........................................................20

*Kim v. Allison*
  87 F.4th 994 (9th Cir. 2023)..............................................................22

*Leyva v. Medline Industries Inc.*
  716 F.3d 510 (9th Cir. 2013) ......................................................12, 27

*Lorang v. Fortis Ins. Co.*
  2008 MT 252, 345 Mont. 12, 192 P.3d 186 .......................................................21

*Mattson v. Milliman, Inc.*
  697 F. Supp. 3d 1109 (W.D. Wash. 2023) .......................................................20

*Parra v. Bashas', Inc.*
  536 F.3d 975 (9th Cir. 2008) .............................................................................17

*Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*
  779 F.3d 934, (9th Cir. 2015) ...........................................................................22

*Ruiz Torres v. Mercer Canyons Inc.*
  835 F.3d 1125 (9th Cir. 2016) ...........................................................................24

*Singleton v. Domino's Pizza LLC*
  976 F. Supp. 2d 665 (D. Md. 2013) ...................................................................27

*Turcios v. Carma Labs., Inc.*
  296 F.R.D. 638 (C.D. Cal. 2014) .......................................................................15

*Tyson Foods v. Bouaphakeo*
  577 U.S. 442, 136 S. Ct. 1036 (2016) ...............................................................24

*Valentino v. Carter-Wallace, Inc.*
  97 F.3d 1227 (9th Cir. 1996) .............................................................................28

*Vaquero v. Ashley Furniture Indus.*
  824 F.3d 1150 (9th Cir. 2016) ...........................................................................27

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338, 131 S. Ct. 2541 (2011) ...............................................................17

*Wang v. Chinese Daily News*
  737 F.3d 538, (9th Cir. 2013) ...........................................................................20

*Wolin v. Jaguar Land Rover N. Am., LLC*
  617 F.3d 1168 (9th Cir. 2010) ...........................................................................27

*Yokoyama v. Midland Nat'l Life Ins. Co.*
  594 F.3d 1087 (9th Cir. 2010) ...........................................................................12

## Rules

Rule 23(a), F. R. Civ. P ................................................................passim

Rule 23(b), F. R. Civ. P. ...............................................14, 23, 24, 28

## Statutes

§ 27-1-221, MCA ............................................................19, 25, 26

§ 33-18- 201, MCA ..............................................................passim

§ 33-18-242, MCA ...........................................................13, 19, 25

28 Texas Admin. Code § 21.203(15) .........................................10

## Treatises

7AA C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 1778, 123-24 (3d ed. 2005) ................................................................24

5 NEWBERG ON CLASS ACTIONS, 8824(b) at 879 (1977) ..................24, 27

## PROCEDURAL BACKGROUND

This action was filed in state court on December 15, 2023. It was an individual action brought by Rutherford because HCSC denied coverage for his cervical spine surgery at Mayo Clinic on grounds that it was "Not Medically Necessary" and then rejected Mayo's appeal.

Discovery revealed that HCSC systematically and programmatically denies claims as not medically necessary without conducting a reasonable investigation based on all available information as required by Montana law. Consequently, Rutherford amended his state court complaint in October 2024 to add class action claims, and the litigation was removed to this Court. In January 2025, Plaintiffs moved for class certification under Rule 23(b)(2) and (b)(3) and filed a brief in support. Doc. 29, 31. HCSC moved to stay the certification motion (Doc. 41) and filed a perfunctory response to the motion. Doc. 46. On June 12, 2025, this Court certified the class under Rule 23(b)(1) and (b)(2), reserved judgment as to (b)(3), and denied the motion to stay. (Doc. 96).

On June 25, HCSC moved for leave to seek reconsideration of the Order certifying the class. Doc. 101. The Court vacated the (b)(2) class prompting Plaintiffs to ask for a chance to brief the reconsideration motion. On August 6, the Court granted both parties leave to file a motion for reconsideration, with briefing deadlines for HCSC and for Rutherford. Doc. 111. The Court reiterated that the

1

(b)(2) class was vacated but kept the (b)(1) class in place pending briefing and gave Rutherford leave to file a supplemental motion for (b)(3) certification. *Id.*

On August 14 and 15, HCSC moved for leave to reconsider the (b)(1) class (Doc. 124) and the (b)(2) class (Doc. 127). On August 29, Plaintiffs filed their brief responding to HCSC's motion for reconsideration and urging the Court to re-certify the (b)(2) class. Doc. 138. The Court held a hearing on this issue on September 4. See, Doc 140.

On December 19, 2025, this Court granted HCSC's Motion for Reconsideration, vacated the (b)(1) certification and held that the (b)(2) certification remained vacated. Doc. 183. The Court reiterated that Plaintiffs may file supplemental motions for (b)(3) certification and (b)(1) certification. *Id.*

Accordingly, this brief consolidates old and new evidence and authority supporting class certification under Rule 23(b)(3). In accordance with this Court's December 19 Order, Plaintiffs will address (b)(1) in a separate motion.

## FACTS PERTINENT TO CLASS CERTIFICATION

<u>Surgery and denial</u>. Rutherford was covered under the Montana University System health plan administered by HCSC d/b/a Blue Cross and Blue Shield of Montana. Doc. 108 (SUF) ¶¶1-3. On June 5, 2023, doctors at the Mayo Clinic recommended spinal surgery to resolve Mr. Rutherford's shoulder pain, and surgery

was completed on June 27, 2023. *Id*. ¶4. Mayo requested pre-authorization but was told robotically that it was not necessary.[1]

Approximately one month after the successful surgery, on July 21, 2023, Plaintiffs were informed that HCSC denied coverage for the surgery as "not medically necessary" under the terms of the Plan. *Id.* ¶5. HCSC denied multiple claims because "it did not receive sufficient documentation to support medical necessity, specifically, MRI records were not provided to substantiate the treatment provided." *Id.*¶6. The letters sent to Rutherford denying his claims said the reason for the denial was "Not Medically Necessary" and further stated that there was "no documentation to support radiographic evidence of cervical nerve root compression (as documented by MRI) consistent with the symptomatic levels of cervical radiculopathy, and debilitating pain [sic] persists despite nonsurgical conservative therapy for at least six weeks…."[2] Between July 21 and August 31, Rutherford received six letters with this same language, denying different associated claims. *Id.*

Records request. On June 30, Mayo submitted 18 pages of records with its bill, which described painful progressive cervical radiculopathy, disk osteophyte complexes with foraminal stenosis at C5-6, C6-7, and failed comprehensive nonoperative treatment, as well as the surgical procedure and successful outcome.[3]

---

[1] Morrison Decl. Ex. 1. BCBSMT_1266-1267; Morrison Decl. Ex. 2. MSWD 0231.
[2] Morrison Decl. Ex. 2. MSWD 223, 224, 226-230.
[3] Morrison Decl. Ex. 1. BCBSMT_1092-1110.

Because Rutherford's procedure had certain CPT codes, it was covered by an HCSC Medical Policy,[4] so a "bit 47" attached to the claim, which suspended the claim pending a medical necessity review and signaled that HCSC should ask for (more) records.[5] Claim coordinator, Yvonne Hencley, noted that "an itemized statement, implant log, and discharge summary are necessary to ensure appropriate payment of services … including but not limited to member benefits and medical necessity." *Id.* The records request went through the Minnesota Blue company, as required by Blue rules, and Mayo was sent a letter requesting: "Patient History and Physical with current treatment plan that includes 06/26/2023-06/26/2023 indication for services, testing, and/or procedures Procedure report for DOS," and Mayo sent *additional records* in response to the request including (on the first page) positive CT scan results that reflected a prior consistent MRI.[6] On the third page, Dr. Sebastian's progress notes stated: "I reviewed the patient's imaging, including X-rays, MRI, and CT scan of the cervical spine. The patient does have advanced spondylosis at the C5-6 level,… [and] a large disk osteophyte complex, right greater than left, at C5-6 causing neuroforaminal stenosis and extruded soft disc herniation on the right side

---

[4] Morrison Decl. Ex. 1, BCBSMT_14232-14244 and 14219-14231.
[5] Morrison Decl. Ex. 1, BCBSMT 15766-15769; Morrison Decl. Ex. 3, Pillatzke Dep. 23:9-16; 29:21-24; 30:1-3; 34:1-12.
[6] Morrison Decl. Ex. 1, BCBSMT 1068-1079; Doc. 158, Ex. F, BCBSMT_1068.

at C6-7, causing significant compression."[7]  These records were received by fax at BCBSMN at 6:01 am on July 18, 2023. *Id.*

Amy Pillatzke, Senior Manager, Regulatory Compliance & Plan Operations, was designated by HCSC to answer questions about the collection of records prior to the claim decision, but she testified that she did not know who decides what records to ask for or whether requirements on that subject are written down anywhere.[8] Other HCSC employees, in November 2025, filed declarations that state an electronic system helps claim coordinators identify which records should be requested for medical necessity review. Doc. 160-9 ¶ 10; 160-7 ¶ 9. In any case, the ambiguous request sent to Mayo, worded and sent by another company, *did not expressly ask for an MRI report or for the records Ms. Hencley said were needed*, (confirming that it is uncertain, unreliable, and no substitute for an investigation.)

NMN review process. Rutherford's claims were handled according to a uniform HCSC process. It involves a nurse "medical reviewer" looking at records submitted by the provider and, if she determines the records do not satisfy HCSC's medical policies, she puts the claim in a queue for review by an HCSC contracted physician "medical director"; if the "MD" agrees that the records in hand do not satisfy the medical policy criteria, the claim is denied. Doc. 108 ¶9

---

[7] *Id.* at BCBSMT_1070.
[8] Morrison Decl. Ex. 3, Pillatzke Dep. 43:5-10.

Nurse Medical Reviewer Kelly Dunkirk, who performed the first review of John Rutherford's claims on July 19, 2023, testified that she reached her not medically necessary conclusion because there was not an MRI showing nerve root compression or evidence of conservative treatment for six weeks; she acknowledged that both of those issues could be resolved with additional documentation. *Id*. ¶ 10. But she did not seek additional documentation because: "It is our process to review with what we have." *Id.* She explained that they only ask for records if they do not have *any* documentation from the date of service in question. *Id*.[9] They match the documentation before them with HCSC policies. *Id*. ¶ 11 They do not call treating providers or policyholders, read medical literature, or contact experts. *Id*. They did not do these things in Rutherford's case and they never do. *Id*.

After Dunkirk reviewed Rutherford's claim from her desk in Illinois, she put it in the queue for review by a physician according to HCSC's standard operating procedure. Dr. Kimberly Warren Ellis, the HCSC contract doctor who denied Rutherford's claims as not medically necessary, pulled it out of the queue on her home computer the same day and pasted Dunkirk's language into the screen, finding

---

[9] It turns out, Dunkirk was reviewing the records Mayo sent with the initial billing; the additional medical records requested from Mayo had been received in the Blue system, but were not reviewed before the denial. Morrison Decl. Ex. 3, Pillatzke Dep. 38:10-39:21.

the claims "Not Medically Necessary" for the same reason and thereby denying them.[10] She testified:

> Q. Your job was simply to look at the HCSC medical policy, which described when it would cover certain kinds of procedure, and determine if the records that you were provided checked the boxes for that policy; Is that fair to say?
>
> A. Correct.
>
> Q. Would you perform any other kind of investigation in determining whether the procedure was not medically necessary?
>
> A. No.
>
> *Id.* ¶12.

In her job reviewing claims for medical necessity and denying claims, she did not reach out to the to the physician or surgeon that was performing the procedure, or the patient plan member who was receiving the procedure; she did not consult any medical literature other than the HCSC medical policy or consult any kind of an expert in the relevant specialty. *Id.* She only dealt with the records she received. *Id.* She did not even look at the requested records that had arrived early the day before at BCBSMT. Doc. 160 at 10-11.  She testified further:

---

[10] HCSC has confirmed that the decision of physicians such as Ellis that the procedure was not medically necessary constitutes denial of the claim. Doc. 31-1, Ex. 3, Pujol depo. at 17. ("The MD makes the decision to approve or deny.") Pillatzke 30(b)(6) depo. p. 52 ("Q. …Kim Warren-Ellis, M.D., who made that determination on July 19th, was the person who denied the claim -- A. Yes. Q. -- is that correct? A. Yes.")

Q. Were you given the option by HCSC to ask for additional medical records?

A. I was never told how to do that or anything about it.

…

Q. So if there were additional medical records that were out there and that were needed in order to check the boxes of the HCSC policy, what was the pathway for the provider to provide those records?

A. I am unaware.[11]

*Id*.

Dr. Ellis is not an expert in orthopedic surgery; her job "entailed reviewing the medical records that were presented and the medical policy, and that is all." *Id*. She has not received any training in the laws that govern the handling of insurance claims and does not ever recall being told that the law requires an insurance company to perform a reasonable investigation before denying a claim. *Id*.

Yvonne Hencley, recently retired HCSC claim coordinator, who was involved in the early handling of John Rutherford's claims, explains:

The medical review process just involves comparing the medical records to the HCSC procedure policy. If medical records in hand do not meet the requirements of the policy, the claim is denied…. If the provider or the patient does not agree with the denial, it is up to them to file an appeal.

*Id*. ¶13.

---

[11] Indeed, HCSC has now confirmed that Ellis did not even wait for the records that had been requested. Doc. 161 ¶ 9. However, all the denial letters that were sent to Rutherford went out after the additional records were received.

HCSC confirmed in its 30(b)(6) testimony through Dr. J.P. Pujol that it reviews "whatever records are provided, and a claim decision is made. If those records do not satisfy the requirements of the medical policy as to medical necessity, then the claim is denied. And if the provider wants to appeal that, they can appeal and send in more records, and the claim can be reconsidered at that time." HCSC explained that "it's not the practice of HCSC to reach out to providers for that information." *Id*. ¶14. HCSC said that would be "impractical." *Id*.

HCSC testified that it does not contact the treating provider in making the claim decision *or a decision on an appeal*. *Id*. ¶15. Yet it also testified that <u>the letter from the treating surgeon, Dr. Ajun Sebastian, which referenced the MRI, was all it needed to reverse the denials and pay the claim</u>. *Id*. (HCSC received the letter 3 ½ months before it reversed the denials.) HCSC reiterated through Ms. Pillatzke that medical reviewers are instructed to reference the Medical Policy and determine whether criteria are met based on the records provided.[12] Once the MD determines that a core procedure is not medically necessary, *associated claims are denied automatically as well*.[13]

On the day that Rutherford's core claims were denied, Dunkirk reviewed 64 large dollar claims. She sent 17 claims (26.5%) for review by the physician. Ellis

---

[12] Morrison Decl. Ex. 3, Pillatzke Dep. 55:16-56:10.
[13] *Id*. Dep. 50:18-20; 51:6-15.

reviewed the 17 claims the same day denying six (36%) as Not Medically Necessary and eight (53%) as E/I/U. Her timecard shows that *she worked one hour that day*.[14] In 2024 discovery responses, HCSC reported that, in the preceding five years, it had denied 15,127 claims in Montana alone as "Not Medically Necessary." According to HCSC, 3,841 (25%) of these claims were appealed by the claimant; 1,165 (30%) of the appeals resulted in the denial being reversed and the claim being accepted and paid. *Id*. ¶16. Ellis denied three non-ERISA claims as NMN that day and the denial letters for *all of them said*: "no document to support"….[15] Plaintiffs have requested the letters from other denials of class members, but HCSC has yet to produce them.

The testimony of Dunkirk, Ellis, Hencley, and HCSC tracks HCSC's Standard Operating Procedure (SOP) relating to medical necessity denials. The cryptically entitled "Medical Director Review for Physical Health" SOP (hereinafter NMN SOP) refers to the nurse claim reviewer (e.g., Dunkirk) as Utilization Management (UM) clinician and defines their role as follows:

> The Utilization Management (UM) Clinician reviews the request and available documentation from the provider or facility. If the information provided does not meet medical policy or guideline criteria for medical necessity, the UM clinician sends the request to the Medical Director (MD) for review and a decision.

---

[14] Assuming 30 seconds to move from file to file, Dr. Ellis spent about three minutes evaluating each claim.

[15] Morrison Decl. Ex. 1, BCBSMT_21414, 21420, 21457 (PI redacted). See also Rutherford's denial letters, note 2, supra.

The SOP defines the MD's role (e.g., Ellis) as follows:

> The MD receives the request from the UM clinician. The MD reviews the member's medical records and other information submitted by the provider, facility, or attending physician. Based on the member's plan, account, and service level, the MD uses appropriate policy and guidelines to determine medical necessity of the requested service. The MD makes the determination to approve or deny.

*Id*. ¶17.

An author of this SOP, Dr. Matthew Smith, has testified that it applies across all states[16] and to both group and retail. Morrison Decl. Ex. 4 (Smith Dep. 22:1-16). Reinforcing the other witnesses, Dr. Smith said: "It's the job of the medical director to look at clinical records, compare the information in those records to the medical policy to determine medical necessity or not at that point." *Id*. 19:24-20:2. The MD makes the medical necessity decision based on the medical records and information that is provided to them. *Id*. 48:20-49:11. This NMN SOP is used in the training process for medical directors. *Id*. 56:5-7.

HCSC has confirmed that the same process is followed regardless of whether HCSC is acting as the insurer or as the TPA.[17]

In response to written discovery requests, HCSC declared: "BCBSMT was not responsible for collecting all relevant medical records. Rather, it was the Mayo

---

[16] The NMN SOP notes that in Texas, which has the same model law, the provider must be given a chance to be heard by a similarly credentialed physician before the denial. Compare, 28 Texas Admin. Code § 21.203(15) and § 33-18- 201(4), MCA.
[17] Morrison Decl. Ex 5, Burns depo. 245:17-21.

Clinic that was required to submit all medical evidence in support of a request for coverage, and in this case, no MRI was submitted to BCBSMT that satisfied the criteria of medical policy SUR712.041….BCBSMT relies on the providers submitting the requests to provide all necessary medical evidence in support of that request." Doc. 108 ¶18.

Plaintiffs' experts on the liability issues all identify the same improper HCSC practice—denying claims without investigation.[18]

## CLASS DEFINITION

Plaintiff John Rutherford brings this action on behalf of himself and others similarly situated (Class Members). The proposed Class is defined as:

> All policyholders and plan members covered under non-ERISA health plans[19] in Montana that are administered by HCSC and subject to Montana claim handling law, who have had claims denied by HCSC within the applicable statute of limitations period, pursuant to the NMN SOP[20], on grounds that the medical procedure being billed was "not medically necessary."[21]

---

[18] See Doc. 168 through 168-8 (Miltenberger declaration and exhibits.); Morrison Declaration, Exs. 6 , 7, and 12 (Reports of Hewitt, Peeno, and Munro).

[19] HCSC can and has, in discovery responses, sorted claims according to ERISA status.

[20] Discovery has confirmed that the iterations of the NMN SOPs attached to Doc. 31-2 are identical as they apply to Montana and represent the only SOP that governs medical necessity denials for all group and retail plans and applies equally whether HCSC is acting as the insurer or the TPA.

[21] The Class includes policyholders with claims that were that were denied and not appealed as well as claims that were denied and appealed regardless of the outcome of the appeal. The Class also includes policyholders with "member responsibility" claims and those with non-member responsibility claims. Such differences present damage questions, which do not detract from the action's suitability for class certification. See, *Butler v. Unified Life Ins. Co*., 2019 U.S. Dist. LEXIS 169138, *4

Plaintiffs also seek certification of a subclass of policyholders/plan members whose claims were denied by HCSC acting as a third-party administrator (the TPA Subclass).[22] The Class and TPA Subclass are subject to the same HCSC process and the same basic claim handling rule, articulated in § 33-18-201(4), which requires a reasonable investigation based on all available information before a claim is denied.

Plaintiffs believe that the class should encompass all claims denied as not medically necessary because: 1) every such denial, by definition, involves insufficient information to satisfy the applicable HCSC medical policy (HCSC states that no claims are denied as NMN categorically based on the procedure)[23], 2) Montana law requires that every such claim be investigated based on all available information before it is denied, and 3) HCSC's process precludes the person making the claim decision from conducting an investigation. Plaintiffs believe a jury could reasonably find that, regardless of the circumstances, a reasonable investigation requires collecting all the relevant medical records and giving the treating provider an opportunity to be heard. The jury could also determine that HCSC's flawed

---

(D. Mont.), citing, *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

[22] This subclass is sought only because the TPA subclass has a three-year statute of limitations as compared to the two-year SOL for claimants proceeding under § 33-18-242, MCA. Discovery has confirmed that HCSC's NMN review process is identical for insured and TPA claimants, and therefore liability issues are the same regardless of that distinction.

[23] Morrison Declaration, Ex. 11, Response to Interrogatory No.9.

system for requesting records prior to the claim review, coupled with the directive to nurses that they should not seek additional records--or even wait for the requested records to arrive--falls short of a reasonable investigation based on all available information.

However, if this Court concludes that the class must be limited to those whose claims were denied as NMN *due to insufficient documentation* to satisfy the applicable HCSC medical policy, that subgroup readily can be identified. As noted above, Rutherford received denial letters that said his claims were not medically necessary because there was "no documentation to support" radiographic evidence of cervical nerve root compression. This phrase was repeated throughout HCSC's system reports.[24] And the two other non-ERISA claims denied by Ellis the same (one hour) day also *both* specified "no document to support" something required by the medical policy. See, n. 14 *supra*. If the Court determines this narrowing is necessary, the class definition can be modified by simply adding the words "due to insufficient documentation to satisfy the applicable HCSC medical policy."

## CLASS CERTIFICATION STANDARD

In order to be maintained as a class action, a suit must meet all of the prerequisite requirements of Rule 23(a), F. R. Civ. P. The action must also fall into

---

[24] Morrison Declaration, Ex. 1. BCBSMT 480-482, 401-403, 678-679, 682, 580-582, 641-642, 533, 535.

at least one of the three categories of maintainable class actions under Rule 23(b), F. R. Civ. P. This Court has already found Rule 23(a), F. R. Civ. P. requirements to be met, but they are reviewed below in abbreviated form, incorporating new evidence.

## DISCUSSION

I.    **The Requirements of Rule 23(a) Are Satisfied**

A.    **Numerosity**

Rule 23(a)(1) requires that the Class be so numerous that joinder of all class members is impracticable. "'Impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Johnson v. City of Grants Pass*, 50 F.4th 787, 803 (9th Cir. 2022).

When "the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014). Similarly, "it is unnecessary for the class representatives to either identify each particular member of a class, or to state the exact number of persons in a class." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 261 (S.D. Cal. 1988). "Instead, trial judges may reasonably infer if numerosity is satisfied from the facts of each particular case." *Id*.

Plaintiffs served interrogatories in February 2025 asking HCSC to identify all members of the putative class.[25] On September 11, HCSC produced an excel

---

[25] Morrison Decl. Ex. 8, Interrogatories No. 4-7.

15

spreadsheet with several thousand claims. Subsequently, HCSC advised that this list was both over and underinclusive. After intervention by this Court (Doc. 170), HCSC produced another list on December 5, which replaced the 9/11 list.[26] This spreadsheet includes names, addresses, claim numbers, dates, amounts, and other data. *Id*. It includes over 19,000 claim line decisions for 5840 policyholder/plan members.[27] HCSC confirmed in a recent 30(b)(6) deposition that this list displays claim lines for non-ERISA plans, whose claims are subject to Montana claim handling law, denied in Montana within the applicable statute of limitations, for "Not Medically Necessary" denial reasons, that as of December 5, 2025, were still denied. HCSC testified that the list also swept in some claims denied as Experimental/Investigational/Unproven (EIU).[28] Plaintiffs have asked HCSC to identify or remove the EIU denials, but they have not yet done so. Based on appeal data produced by HCSC, forensic economist Charity Rowsey has estimated that 30% of the denials on the list are attributable to EIU determinations.[29] HCSC also produced appeal information for relevant claims. While discovery continues to refine these lists, there are clearly thousands of class members and numerosity is easily satisfied. Moreover, we have identified class members with multiple fields of

---

[26] Morrison Declaration, Ex. 9. (Dep. Ex. 59); Morrison Decl. Ex 5, Burns depo. 70-71.
[27] Rowsey Declaration, Ex. 10 (Report) Op. 7.
[28] Morrison Decl. Ex 5, Burns depo. 77, 79.
[29] Rowsey Report at 5-6, Ex. 10.

data as well as HCSC systems necessary for updating this data for trial and/or reprocessing.

### B.    Commonality

Commonality requires "questions of law or fact common to the class." F. R. Civ. P. 23(a)(2). "Claims by class members and their representatives must depend upon a common contention of such a nature that it is capable of class-wide resolution...." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2545 (2011). This district has referred to commonality as a "permissive" requirement. *Beck v. City of Whitefish*, 2023 U.S. Dist. LEXIS 175922, at *20 (D. Mont. Sep. 29, 2023). As the Ninth Circuit has stated, "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008).

The law and facts at issue here are common to the class. HCSC's alleged wrongdoing against Plaintiff and other Class Members flows from Defendants' systematic and programmatic approach to denying claims as not medically necessary. The common questions include, without limitation, the following:

1.    Does HCSC's NMN SOP violate Montana's law that requires a reasonable investigation based on all available information?

17

2.    Does HCSC's declared position that it is "not responsible for collecting all relevant medical records," before denying claims violate Montana's reasonable investigation requirement?

3.    Does HCSC's standard practice of denying claims as not medically necessary without the claim adjudicators being able to investigate violate Montana's reasonable investigation requirement?

4.    Does HCSC's standard practice of denying claims as not medically necessary based on lack of documentation required by HCSC Medical Policies without first asking specifically for the needed documentation violate Montana's reasonable investigation requirement?

5.    Does HCSC's declared policy of placing the burden on the provider to appeal (following a claim denial) if they wish to have additional information or documentation considered on the question of medical necessity violate Montana's reasonable investigation requirement?

6.    Does HCSC's system for sending a general records request to the provider satisfy Montana's law that requires a reasonable investigation based on all available information before denying claims?

7.    Does HCSC violate Montana's reasonable investigation law by denying claims as not medically necessary without consulting the treating provider or involving a physician with the same credentials?

18

8.      Has HCSC been unjustly enriched by denying claims as not medically necessary without conducting a reasonable investigation based on all available information?

9.      Is reprocessing an appropriate remedy?

10.      Is the billed amount of the denied claim the appropriate measure of economic damages?

11.      Does HCSC's systematic approach to medical necessity denials constitute actual malice as defined in § 27-1-221, MCA?

12.      If so, what amount of punitive damages is appropriate?

Plaintiff can answer each of these questions on a class-wide basis using the same evidence that will be used to prove his own claim. Doc. 4, ¶ 90.[30]

In determining commonality, the Court's inquiry is limited to verifying the existence of common questions of law or fact, rather than considering the merits of the underlying claims. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)). In addition, "so long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013) (cleaned up).

Here, the commonality requirement is met and exceeded.

---

[30] As shown above, HCSC followed the same process whether acting as insurer or TPA, and is subject to the same investigation requirement, articulated in § 33-18-201(4), whether the action is brought under § 201 (TPA) or under § 242 (insurer).

19

### C.    Typicality

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis* 657 F.3d at 984. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id*.

"Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir. 2020). Importantly here, "it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017). So even if putative class members "have each suffered different degrees of harm from Defendants' alleged breaches, the allegation that the harms arose from the same set of policies and practices satisfies typicality." *Mattson v. Milliman, Inc.*, 697 F. Supp. 3d 1109, 1114 (W.D. Wash. 2023).

Plaintiff's claims are typical of the Class's claims. HCSC denied John Rutherford's claims under HCSC's standard operating procedure, just like all proposed members of the Class, because the billed procedures were "not medically necessary." The fact that Rutherford's bills were paid after he sued is of no consequence because this is a UTPA based claim that accrues when the wrongful

20

denial occurs and survives after later payment of the claim. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, 345 Mont. 12, 192 P.3d 186. Because the NMN denial system at HCSC is identical whether HCSC is acting as TPA or insurer, Rutherford is also typical of both groups for purposes of this case. The fact that Rutherford is no longer covered by an HCSC plan is unimportant, since the class and claims are defined by past claim denials and not current plan status.[31] Answering whether this programmatic and systematic approach to medical necessity denials violates Montana law is the same for Rutherford and all class members. Thus, Rutherford's claims are typical of the other Class members' claims and Rule 23(a)(3) is satisfied.

### D.    The Named Plaintiff Will Adequately Protect the Interest of The Class

Per F. R. Civ. P. 23(a)(4), the Court must find that the representative parties will fairly and adequately protect the interests of the class. Known as "adequacy," this "inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023).

---

[31] The exception is the prospective injunction as worded in SAC Count IX, ¶ 99. Doc. 4. However, Rutherford is identically situated with all class members as to reprocessing as an injunctive remedy.

### 1.   No Conflicts

"Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *Id*. This means that a conflict must be "actual" and not merely speculative. *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003). No such conflict exists here.

### 2.   Vigorous Pursuit

Regarding vigorous pursuit, "the relevant inquiry is whether the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*, 779 F.3d 934, 943 (9th Cir. 2015) (cleaned up).[32] The Ninth Circuit has noted there are "no fixed standards by which 'vigor' can be assayed" but "considerations include competency of counsel . . . ." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998). Other factors include "an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985. Here, proof that the HCSC medical necessity denial system is unlawful will benefit Rutherford and every member of the Class equally.

Plaintiffs have retained competent counsel. John Morrison and Scott Peterson are experienced Montana trial lawyers who have successfully litigated multiple class

---

[32] See John Rutherford Declaration filed herewith.

actions and have extensive experience with insurance-related lawsuits in Montana. See Morrison Class Certification Declaration. Doc. 31-3.

## II.    The Requirements of Rule 23(b)(3) Are Satisfied

In addition to the requirements of F. R. Civ. P. 23(a), <u>one</u> of the three subdivisions of Rule 23(b) must be satisfied. Plaintiffs herein seek certification of the class under Rule 23(b)(3).

Rule 23(b)(3) provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

 …

(3)    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Plaintiff's class claims, Counts VIII through XIV, satisfy the conditions for certification under Rule 23(b)(3). This requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F. R. Civ. P. 23(b)(3).

### A.    Predominance

The Rule 23(b)(3) predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods v.*

*Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 1045 (2016) (quoting *Newberg on*

*Class Actions*). When "one or more of the central issues in the action are common

to the class and can be said to predominate, the action may be considered proper

under Rule 23(b)(3) even though other important matters will have to be tried

separately, such as damages or some affirmative defenses peculiar to some

individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-

454 (2016). (citing 7AA C. Wright, A. Miller, & M. Kane, Federal Practice &

Procedure § 1778, 123-24 (3d ed. 2005)). "[M]ore important questions apt to drive

the resolution of the litigation are given more weight in the predominance analysis

over individualized questions which are of considerably less significance to the

claims of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th

Cir. 2016).

The common issues articulated above predominate over all others. The

overarching issue is whether HCSC's NMN denial process violates § 33-18-201(4).

Resolving this issue in the Class's favor entitles class members to appropriate

relief—which may include payment of wrongfully denied claims or, at a minimum,

reprocessing. Moreover, the evidence that Rutherford uses to prove his own claim

will prove each of the class claims including whether HCSC's conduct constitutes

malice under § 27-1-221, MCA.

24

This predominance showing is not abstract. Each of Plaintiffs' class claims rises or falls on common proof of the same uniform claim-handling policy and practice. For declaratory and injunctive reprocessing relief, the dispositive question is whether HCSC's NMN SOP and related, repeatedly admitted practices systematically fail to satisfy Montana's "reasonable investigation based on all available information" requirement before issuing NMN denials. HCSC's standardized medical necessity review workflow—by design—confines the decisionmaker to "records in hand," without a meaningful mechanism to obtain missing, readily available information before denial. That same common proof establishes liability whether the claimant proceeds directly under § 201 (where HCSC acted as TPA) or via § 33-18-242 (where HCSC insured the risk) as well as under negligence per se. Unjust enrichment similarly turns on common proof that HCSC realized a benefit by systematically denying and delaying payment through an unlawful process. Finally, punitive damages under § 27-1-221 present a common, corporate-conduct question: whether HCSC's programmatic adherence to a process that precludes reasonable investigation—despite known legal duties—constitutes actual malice as defined in § 27-1-221, MCA.

Nor do individual medical facts defeat predominance, because the class-wide liability issue is not whether each procedure was medically necessary in hindsight. It is whether HCSC's standardized process is inconsistent with Montana law.

25

Multiple layers of evidence confirm that the nurse reviewer and medical director make the denial decision based only on whatever records happen to be in hand, without contacting treating providers, without seeking additional records, and without a pathway to obtain missing information before denial. Individualized issues, to the extent they remain, go to (1) the amount of loss caused by the denial (which HCSC's claims data can calculate once the measure is determined) and (2) administration of the remedy (including reprocessing under lawful standards). Those issues are manageable and do not "drive the resolution" of the litigation; the aggregation-enabling liability question—whether the SOP and admitted practices violate § 33-18-201(4)—will be proved (or disproved) through common evidence and resolved in one stroke for the class.

Importantly, in determining whether common questions predominate, the focus is on liability, not damages. *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 677 (D. Md. 2013). "[T]he 'overwhelming weight of authority' holds that the need for individual damages calculations does not diminish the appropriateness of class action certification where common questions as to liability predominate." 5 NEWBERG ON CLASS ACTIONS, 8824(b) at 879 (1977). Variation in damages between class members is not a legal basis to deny certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) [citations omitted]. This rule is "well settled." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

26

Defendant's uniform action towards Class members and the resulting violation of the Class members' statutory rights represent the core issues of this case and they predominate over any individual questions.

### B.    Superiority

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010). Superiority asks "the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair. This analysis is related to the commonality test. Underlying both tests is a concern for judicial economy." *Id.* (cleaned up). Where, as here, "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Rule 23(b)(3) identifies four factors to be considered in addressing this element: (1) The interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims and the particular forum; and

(4) the difficulties likely to be encountered in the management of a class action. See, e.g., *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal.2017).

Here, any class member has the right to be separately represented or opt out. There is no other litigation concerning this controversy. And this forum is desirable because of this Court's statewide stature and expertise in class litigation. Finally, this case does not present likely management difficulties. This is not a multi-pronged, multi-defendant class action. It is confined to one state, one defendant, one corporate policy, and one overarching issue. And HCSC has shown, albeit under court mandate, that it can readily identify the members of the class, which will facilitate notice and the appropriate remedies.

## CONCLUSION

For the reasons stated and discussed above, Plaintiffs respectfully urge this Court to certify the Class and subclass and appoint John Morrison and Scott Peterson, Morrison Sherwood Wilson Deola PLLP as class counsel.

DATED this 24th day of February 2026.

By:    /s/ John Morrison
       John M. Morrison
       Scott L. Peterson
       MORRISON SHERWOOD WILSON DEOLA PLLP

       *Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the Montana Federal Local Rules of Procedure, I certify that the foregoing document is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double spaced; and the word count calculated by Microsoft Word 2016 for Mac is 6,490 excluding table of contents, table of authorities, certificate of compliance and certificate of service.

DATED this 24th day of February, 2026.

By:    /s/ John Morrison
       John M. Morrison
       Scott L. Peterson
       MORRISON SHERWOOD WILSON DEOLA PLLP

       *Attorneys for Plaintiffs*

29